UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -:
SHLD, LLC, DAVID MONTEAU, HARVEY      :      15 Civ. 6225 (LLS) (JCF)
NEWMAN, STUART SALLES, and            :
LAURENCE WILNEFF,                     :          REPORT AND
                                      :       RECOMMENDATION
            Plaintiffs,               :
                                      :
      - against -                     :
                                      :      ┌─────────────────────────────┐
NICHOLAS HALL, AMAR SHAH, TIER        :      │ USDS SDNY                   │
HALL, LTD., TIER HALL  CONSULTING,    :      │ DOCUMENT                    │
LTD., INDEPENDENT SERVICES GROUP,     :      │ ELECTRONICALLY FILED        │
LTD., INDEPENDENT BROKING             :      │ DOC #:_____        │
SOLUTIONS, LTD., THE IVY GROUP,       :      │ DATE FILED: _3/30/17_       │
LLC, MINORIES LAW LIMITED,            :      └─────────────────────────────┘
JEREMY BLOOMER, and NIGEL FRUDD,      :
                                      :
            Defendants.               :
- - - - - - - - - - - - - - - - - -:
TO THE HONORABLE LOUIS L. STANTON, U.S.D.J.:

      This action centers on a scheme to deliver "investor-funded

life insurance to employee associations and union groups in New

York." (Second Amended Complaint ("SAC"), ¶ 181).  Alleging that

the defendants breached an agreement to "create and structure a

bond that would provide the needed capital" for the program (SAC,

¶ 3), the plaintiffs -- SHLD, LLC ("SHLD"), David Monteau, Harvey

Newman, Stuart Salles, and Laurence Wilneff -- filed this action

for breach of contract, as well as conversion and other torts.

When defendants Nicholas Hall, Amar Shah, and Tier Hall Consulting,

Ltd. (collectively, the "Defaulting Defendants") failed to answer,

certificates of default were entered and the case was referred to

me for a hearing on damages.  The Defaulting Defendants failed to appear at the inquest held on February 14, 2017.  The following findings are therefore based on evidence provided by the plaintiffs.  I recommend that the plaintiffs be awarded $265,000 in damages plus prejudgment interest measured at 9% from March 11, 2015, until the date judgment is entered, and $710.00 in costs.

Background

The individual plaintiffs in this action are the members of SHLD; each is a citizen of the United States and resides in either Illinois or New York.  (SAC, ¶¶ 10-13, 194; Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("Proposed Findings"), ¶ 2).  The Defaulting Defendants are (or were, in the case of Tier Hall Consulting, Ltd. ("Tier Hall Consulting")) citizens of the United Kingdom; Nicholas Hall and Amar Shah were the principals and owners of Tier Hall Consulting.  (SAC, ¶¶ 15, 20-21; Proposed Findings, ¶¶ 3, 5).  Most of the other defendants -- Tier Hall, Ltd. ("Tier Hall"), Independent Broking Solutions, Ltd., Independent Services Group, Ltd., Minories Law Ltd., and Nigel Frudd -- are citizens of the United Kingdom.  (SAC, ¶¶ 14, 16-17, 19, 22; Proposed Findings, ¶¶ 4, 6-8).  The Ivy Group, LLC, has its principal place of business in Connecticut, and its members are domiciled in Connecticut or Massachusetts; its principal, Jeremy Bloomer, is a citizen of the United States and is domiciled

2

in Massachusetts.[1]  (SAC, ¶¶ 18, 23; Proposed Findings, ¶ 9).

The individual plaintiffs "conceived of The Amalgamated Life Insurance and Annuity Network Trust of New York ("ALIANT") as a project to deliver investor-funded life insurance to employee associations and union groups in New York State."  (Proposed Findings, ¶ 10; SAC, ¶ 180).  Between January and September 2013, the individual defendants met with Mr. Hall and Mr. Shah in New York and elsewhere to discuss the project.  (SAC, ¶¶ 183-184, 192; Proposed Findings, ¶¶ 11-18).  More specifically, a meeting in New York between the individual plaintiffs and Mr. Hall on July 22, 2013, culminated in a draft proposal by which Tier Hall, Ltd., would manage the creation and structuring of an investment vehicle.  (SAC, ¶¶ 187-188; Draft Proposal, attached as Exh. 1 to SAC; Proposed Findings, ¶¶ 13-14).  For an initial investment from the plaintiffs of $300,000, Tier Hall would engage advisors with an eye to recruiting investors and developing a business plan within two to three months.  (SAC, ¶¶ 190-191; Draft Proposal; Proposed Findings, ¶¶ 14-16).  After a September 30, 2013 meeting in New York among the individual plaintiffs and Mr. Shah, a non-disclosure agreement was entered into, with Mr. Shah signing on behalf of Tier Hall.  (SAC, ¶¶ 192-193; Proposed Findings, ¶¶ 18-19).

---

[1] Each of the non-defaulting defendants has been dismissed from the action or has settled.  (Proposed Findings, ¶¶ 64-68).

The individual plaintiffs formed SHLD in October 2013 as "a vehicle to develop and fund the administrative structure and reserves required for ALIANT through the bond" that Mr. Hall, Mr. Shah, and Tier Hall Consulting were to create. (SAC, ¶ 194, Proposed Findings, ¶ 20). Immediately afterward, Mr. Shah informed the plaintiffs that an additional $30,000 would be needed to form an Irish bond company to hold the portfolio of "life settlements" that would back the bond.[2] (SAC, ¶¶ 194-195; Proposed Findings, ¶¶ 20-21). This additional amount was incorporated into a "Heads of Terms" agreement between SHLD and Tier Hall Consulting,[3] which Mr. Hall signed on behalf of Tier Hall Consulting. (SAC, ¶¶ 198-199; Heads of Terms Agreement; Proposed Findings, ¶¶ 22-23). That agreement required Tier Hall Consulting to form the aforementioned Irish bond company within three to six months of the payment of the plaintiffs' $330,000. (SAC, ¶ 207; Head of Terms Agreement at 1; Proposed Findings, ¶ 29). It further

---

[2] A "life settlement" describes the situation where "a life insurance policy owner sells his or her policy to an investor in exchange for a lump sum payment. The amount of the payment . . . to the policy owner is generally less than the death benefit on the policy, but more than its cash surrender value." Investor Bulletin on Life Settlements, https://www.sec.gov/investor/alerts/lifesettlements-bulletin.htm (last visited March 28, 2017).

[3] The agreement misidentifies Tier Hall Consulting as Tier Hall Consultancy, LLC. (SAC, ¶ 200; Heads of Terms Tier Hall Consultancy Limited and SHLD LLC dated Oct. 18, 2013 ("Heads of Terms Agreement"), attached as Exh. 2 to SAC).

required, among other things, that within three to six months of the execution of a binding agreement, Tier Hall Consulting would (1) hire the company's board and legal, actuarial, and accountancy teams; (2) work with the bond distribution platform, (3) execute a service agreement with the charitable trust that would own the bond company, (4) "project manage the whole transaction including the professional advisors," and (5) recruit potential investors and develop a business plan. (SAC, ¶¶ 207-211; Heads of Terms Agreement at 1; Proposed Findings, ¶¶ 29-33).

The Heads of Terms Agreement was later incorporated into the parties' final contract, which Mr. Hall signed as "partner" and Mr. Shah signed as "director" of Tier Hall Consulting. (SAC, ¶ 202; Letter of David G. Monteau dated Oct. 31, 2013 ("Monteau Letter"), attached as part of Exh. 3 to SAC; Proposed Findings, ¶ 24). The final contract was to be governed by the laws of the United States, and required Tier Hall Consultants to perform the services outlined in the Heads of Terms Agreement "in accordance with [its] performance milestones," supply periodic progress reports, and provide a list of subcontractors, among other things (SAC, ¶¶ 203-204, 212; Terms and Conditions of Engagement ("Final Contract"), attached as part of Exh. 3 to SAC, ¶¶ 3.1, 3.2, 3.6, 12.5.1 & Schedule 1; Proposed Findings, ¶¶ 25-26, 34). If Tier Hall Consulting failed to complete the services it was contracted

to perform, failed to complete them to SHLD's satisfaction, or failed to complete them on time, SHLD could demand a refund, terminate the agreement, or both. (SAC, ¶¶ 205-206; Final Contract, ¶¶ 9, 10.1-10.3; Proposed Findings, ¶¶ 27-28).

By November 15, 2013, the plaintiffs had made the entire $330,000 payment. (SAC, ¶ 213; Proposed Findings, ¶ 35). Three months later, Mr. Shah provided a draft "teaser" for prospective investors and informed the plaintiffs that he was "a month behind." (SAC, ¶ 218; Proposed Findings, ¶ 37). The plaintiffs expressed their dissatisfaction with the teaser, as well as with the absence of monthly reports and lack of overall progress. (SAC, ¶ 219; Proposed Findings, ¶ 38). Over the next months, Tier Hall Consulting continued to miss deadlines and failed to show progress on funding. (SAC, ¶ 221-39; Proposed Findings, ¶ 40). When no investors had been found by December 2014, the plaintiffs requested a list of itemized expenditures from Mr. Hall. (SAC, ¶ 239, 242; Proposed Findings, ¶¶ 40-41). Mr. Hall detailed the following expenditures:

1.   $40,000 to legal advisors Minories Law Limited;

2.   $85,000 to The Ivy Group;

3.   $65,000 to Independent Services Group;

4.   $120,000 to Tier Hall Consulting; and

5.   $20,000 in general expenses.

(SAC, ¶ 243; Proposed Findings, ¶ 42).  These expenses were either unauthorized and therefore in violation of the parties' agreement, or unearned in light of the lack of "reasonably competent or timely work-product."  (SAC, ¶ 248, Proposed Findings, ¶¶ 44-48).  In addition, as the bond company was never formed, the "defendants [] put to other uses the $30,000 that had been added to the start-up fee allegedly to address additional expenses relating to the formation of the bond company." (Proposed Findings, ¶ 43; SAC, ¶ 247).  The plaintiffs terminated the contract on March 11, 2015, and demanded a refund of their $330,000.  (SAC, ¶ 249; Proposed Findings, ¶ 49).  The Defaulting Defendants refused to return the money.  (SAC, ¶ 251; Proposed Findings, ¶ 49).

<u>Discussion</u>

    A.   <u>Legal Standards</u>

Where a defendant has defaulted, all of the facts alleged in the complaint, except those relating to the amount of damages, must be accepted as true.  <u>See</u> <u>Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.</u>, 109 F.3d 105, 108 (2d Cir. 1997); <u>Keystone Global LLC v. Auto Essentials, Inc.</u>, 12 Civ. 9077, 2015 WL 224359, at *3 (S.D.N.Y. Jan. 16, 2015).  The court may also rely on factual allegations pertaining to liability contained in affidavits and declarations submitted by the plaintiffs.  <u>See, e.g.</u>, <u>Tamarin v. Adam Caterers, Inc.</u>, 13 F.3d 51, 54 (2d Cir.

1993). Nonetheless, a court "must still satisfy itself that the plaintiff has established a sound legal basis upon which liability may be imposed." <u>Jemine v. Dennis</u>, 901 F. Supp. 2d 365, 373 (E.D.N.Y. 2012). Once liability has been established, the plaintiff must provide evidence establishing the amount of damages with reasonable certainty. <u>Transatlantic Marine Claims Agency</u>, 109 F.3d at 111.

   B.   <u>Liability</u>[4]

      1.   <u>Breach of Contract</u>

   "[A] federal court exercising diversity jurisdiction must apply the choice-of-law rules of the state in which that court sits to determine the rules of decision that would apply if the suit were brought in state court." <u>Liberty Synergistics Inc. v. Microflo Ltd.</u>, 718 F.3d 138, 151 (2d Cir. 2013). In a contract case, New York choice of law principles require a court to apply the "law of the jurisdiction with the most significant interest in, or relationship to, the dispute," taking into account "a spectrum of significant contacts, including the place of

---

   [4] Jurisdiction is predicated on diversity. 28 U.S.C. § 1332. The plaintiffs plead sufficient facts to establish personal jurisdiction over the Defaulting Defendants. (SAC, ¶¶ 25, 30-31, 35, 40-41, 45, 50-51, 55, 60-61). Moreover, a prior opinion by the Honorable Louis S. Stanton, U.S.D.J., suggests that the plaintiffs have adequately alleged personal jurisdiction over the Defaulting Defendants. <u>See</u> <u>SHLD, LLC v. Hall</u>, No. 15 Civ. 6225, 2016 WL 659109, at *5 (S.D.N.Y. Feb. 17, 2016).

contracting, the places of negotiation and performance, the location of the subject matter, and the domicile . . . of the contracting parties." Bank of New York v. Yugoimport, 745 F.3d 599, 609 (2d Cir. 2014) (alteration in original) (quoting Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1031 (2d Cir. 1996)). "New York choice-of-law rules also 'require[] the court to honor the parties' choice [of law provision] insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated.'" Id. (alterations in original) (quoting Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir. 1987)). As noted, the Final Contract requires application of U.S. law. The only two states with a relationship to the agreements at issue here are Illinois, where Mr. Monteau and Mr. Wilneff live (SAC, ¶¶ 10, 13), and New York, where Mr. Newman and Mr. Salles live and where the agreements were largely negotiated (SAC, ¶¶ 11-12, 187, 192-193; Proposed Findings, ¶¶ 13-14, 18-19).

The elements of a breach of contract claim under New York law are (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of contract by the defendant; and (4) damages. See Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co., 375 F.3d 168, 177 (2d Cir. 2004). The elements are the same under Illinois law. See Gonzalzles v.

9

American Express Credit Corp., 315 Ill. App. 3d 199, 206, 733 N.E.2d 345, 351 (Ill. App. Ct. 2000).  There is therefore no actual conflict, and I will apply New York law as the law of the forum state.  As should be obvious from the factual background discussed above, each of these elements is met here:  The Final Contract is an enforceable agreement; the plaintiffs performed by remitting their $330,000; the defendants breached by failing to perform and failing to return the $330,000; and this caused the plaintiffs damages in the amount of the unreturned funds.

    2.  Conversion

    To determine what law applies to tort causes of action, courts must engage in "[t]wo separate inquiries . . . :  (1) what are the significant contacts and in which jurisdiction are they located; and[] (2) whether the purpose of the law is to regulate conduct or allocate loss."  Padula v. Lilarn Properties Corp., 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 311 (1994).  Here, the jurisdictions with significant contacts are New York, Illinois, and the United Kingdom.  As to the second inquiry, where "conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  Id. at 522, 620 N.Y.S. at 311 (quoting Cooney v. Osgood Machinery, Inc., 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 922 (1993)).  Here, the tortious

conduct alleged -- conversion of the $330,000 that the plaintiffs provided to the defendants -- took place in the United Kingdom. See, e.g., Pentagen Technologies International, Ltd. v. CACI International Inc., No. 93 Civ. 8512, 1996 WL 435157, at *12 (S.D.N.Y. Aug. 2, 1996) ("The locus of a conversion is the [jurisdiction] where the defendant's acts respecting the allegedly converted property are committed."), adhered to on reconsideration, 1996 WL 434551 (S.D.N.Y. Aug. 2, 1996).

The plaintiffs cite only New York law in support of this claim. They have not provided guidance on the law of conversion in the United Kingdom. Rule 44.1 of the Federal Rules of Civil Procedure allows a court to determine the content of foreign law based on "any relevant material or source . . . whether or not submitted by a party." However, it does not require a court "to undertake its own analysis to determine" the content of foreign law. In re Nigeria Charter Flights Contract Litigation, 520 F. Supp. 2d 447, 458 (E.D.N.Y.2007); see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas, No. 04 Civ. 10014, 2010 WL 3306876, at *4 (S.D.N.Y. Aug. 20, 2010) (collecting cases). I decline to do so here and therefore apply New York law. See, e.g., In re Nigeria Contract Flights, 520 F. Supp. 2d at 458 (collecting cases holding that under New York choice of law rules, forum law applies where litigant fails to establish content of

11

foreign law).

Under New York law, the plaintiffs' claim fails.  Conversion requires the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."  Polanco v. NCO Portfilio Management, Inc., 23 F. Supp. 3d 363, 370 (S.D.N.Y. 2014) (quoting Thyroff v. Nationwide Mutual Insurance Co., 460 F.3d 400, 403-04 (2d Cir. 2006)).

> [T]o state a claim for conversion, [a] plaintiff must allege that '(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused.

Id. (second and third alterations in original) (quoting Sabilia v. Richmond, No. 11 Civ. 739, 2011 WL 7091353, at *19 (S.D.N.Y. Oct. 26, 2011)).  "Where the original possession is lawful, a conversion does not occur until the defendant refuses to return the property after demand or until he sooner disposes of the property."  Usov v. Lazar, No. 13 Civ. 818, 2013 WL 3199652, at *7 (S.D.N.Y. June 25, 2013) (quoting Thryoff v. Nationwide Mutual Insurance Co., 360 F. App'x 179, 180 (2d Cir. 2010)).

"[A]n action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question."  Manufacturers Hanover Trust Co. v. Chemical Bank, 160

A.D.2d 113, 124, 559 N.Y.S.2d 704, 712 (1st Dep't 1990).  The
plaintiffs have not sufficiently identified the fund involved,
however.  When the alleged converted property is money, the money
must be "described or identified in the same manner as a specific
chattel."  Interior by Mussa, Ltd. v. Town of Huntington, 174
Misc. 2d 308, 310, 664 N.Y.S.2d 970, 972 (2d Dep't 1997) (quoting
9310 Third Ave. Associates, Inc. v. Schaffer Food Service Co., 210
A.D.2d 207, 208, 620 N.Y.S.2d 255, 256 (2d Dep't 1994)).
Generally, identification of a specific sum and a "specific, named
bank account" into which it was transferred is sufficient to state
a claim for conversion.  Eldesouky v. Aziz, No. 11 Civ. 6986, 2014
WL 7271219, at *14 (S.D.N.Y. Dec. 19, 2014) (quoting Republic of
Haiti v. Duvalier, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st
Dep't 1995)); see also DeAngelis v. Corzine, 17 F. Supp. 3d 270,
283 (S.D.N.Y. 2014) (holding funds properly identified as chattel
where they were "segregated and identifiable"); Manufacturers
Hanover Trust, 160 A.D.2d at 114, 125, 559 N.Y.S.2d at 706, 712
(finding conversion claim sufficient where plaintiff identified
amount and account number).  Here, the Second Amended Complaint
and Proposed Findings of Fact allege merely that "[o]n November 6,
2013, $33,000 was wired to defendant Tier Hall Consulting.  The
remaining $297,000 was wired to defendant Tier Hall Consulting on
November 14, 2013."  (SAC, ¶ 213; Proposed Findings, ¶ 35).  No

13

account is identified; indeed, the plaintiffs do not even specify that the entire amount was transferred to a single account. Even taking the plaintiffs' allegations as true, then, they have not established a conversion claim.[5] See, e.g., Sang Lan v. Time Warner, Inc., No. 11 Civ. 2870, 2014 WL 764250, at *6 (S.D.N.Y. Feb. 25, 2014) (dismissing conversion claim where complaint failed to name account into which allegedly converted funds deposited).

C.   Damages

1.   Amount

The plaintiffs paid $330,000 under the parties' agreements. When they terminated the Final Contract, they were entitled to a refund of the proportion of that amount "commensurate with that part (if any) of the [s]ervices undertaken to [SHLD's] satisfaction (acting reasonably)." (Final Contract, ¶ 10.3). The plaintiffs have alleged that Tier Hall Consulting's work product was unsatisfactory. (Proposed Findings, ¶¶ 44-48; SAC, ¶ 248). Therefore, they are entitled to a refund of the entire amount. See, e.g., House of Diamonds v. Borgioni, LLC, 737 F. Supp. 2d

---

[5] I express no opinion as to whether the other requirements of the plaintiffs' conversion claim, such as the breach of a legal duty independent of the contract, see, e.g., Carvel Corp. v. Noonan, 350 F.3d 6, 16-17 (2d Cir. 2003), are met. Cf. SHLD, 2016 WL 659109, at *9 (indicating that conversion claim was duplicative of breach of contract claim, but that plaintiffs could plead it in the alternative to breach of contract claim because liability under contract was disputed).

162, 172 (S.D.N.Y. 2010) (noting that contract damages should put plaintiff in same economic position as if defendant had performed). However, they have already collected $65,000 from a settlement of claims against Independent Services Group, Ltd., and Tier Hall. (Proposed Findings, ¶ 67).  The amount of damages is therefore $265,000.

   2.  Prejudgment Interest

   "In a diversity case, state law governs the award of prejudgment interest."  Schipani v. McLeod, 541 F.3d 158, 165 (2d Cir. 2008).  Under New York law, prejudgment interest for breach of contract is measured at 9% per year from the "earliest ascertainable date that the cause of action existed."  N.Y. CPLR §§ 5001(b), 5004.  The plaintiffs seek prejudgment interest from March 11, 2015, the date the Final Contract was terminated and they demanded return of the money.  (Proposed Finding, ¶ 85).  As interest accrues at a rate of $65.34 per day (i.e. 9% of $265,000 divided by 365), as of the date of this Report and Recommendation, the plaintiffs are entitled to interest in the amount of [$49,005 as of March 30, 2017].

   3.  Joint and Several Liability

   The plaintiffs contend that each of the Defaulting Defendants is jointly and severally liable for the damages award.  (Proposed Findings, ¶ 72).  A preliminary question is whether Mr. Hall and

15

Mr. Shah can be held personally liable for the breach of the Final Contract.   The plaintiffs assert that personal liability is appropriate here because Mr. Hall and Mr. Shah (1) both signed the contract, (2) negotiated the contract, (3) were to perform the services for which the plaintiffs contracted, (4) were the sole points of contact during the period the contract was in force, (5) "interchangeably used different companies which they owned and controlled to interact with [the] plaintiffs," and (6) controlled both Tier Hall Consulting, the contracting party, and Tier Hall, the entity used during negotiations.   (Proposed Findings, ¶ 73).

Pursuant to New York law, "an agent who signs an agreement on behalf of a disclosed principal will not be individually bound to the terms of the agreement 'unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal.'"   Cement and Concrete Workers District Council Welfare Fund, Pension Fund, Legal Services Fund and Annuity Fund v. Lollo, 35 F.3d 29, 35 (2d Cir. 1994) (quoting Lerner v. Amalgamated Clothing and Textile Wokers Union, 938 F.2d 2, 5 (2d Cir. 1991)).   In analyzing this issue, courts consider

> various iterations of the following factors: (1) the
> length [in pages] of the contract; (2) the placement of
> the liability clause [personally binding the signatory
> to the terms of the contract]; (3) the appearance of the
> signatory's name in the agreement itself; (4) the nature

of the negotiation that surrounded the contract; and (5)
the signatory's role in the company.

Raymond Weil, S.A. v. Theron, 585 F. Supp. 2d 473, 482 (S.D.N.Y.
2008).

As the second factor indicates, and as the cases confirm, a
contract generally must include a provision assigning personal
liability to the individual signatory for a court to impute such
liability to that individual. See, e.g., Lollo, 35 F.3d at 35
(citing "provision unequivocally fix[ing] personal liability on
the signatory"); USHA Holdings, LLC v. Franchise India Holdings,
Ltd., No. 12 CV 3492, 2015 U.S. Dist. LEXIS 133644, at *33
(E.D.N.Y. Sept. 11, 2015) ("[T]he first page of the Agreement
clearly identifies [the individual defendant and signatory] as a
party to the Agreement."); Raymond Weil, 585 F. Supp. 2d at 483
(citing provision stating that agreement "shall bind and inure to
the benefit of [the individual defendant and signatory]"); Porter
v. Property Damage Control Group, Inc., No. 03 CV 5972, 2007 WL
2907403, at *3 (E.D.N.Y. Sept. 28, 2007) ("[T]he contract's first
sentence identifies [the individual defendant and signatory] as
among the parties it binds . . . ."); Paribas Properties, Inc. v.
Benson, 146 A.D.2d 522, 524-26, 536 N.Y.S.2d 1007, 1008-10 (1st
Dep't 1989) (identifying provision making contractual obligations
joint and several among individual signatories and corporate

17

entity).   Indeed, the first factor -- the page-length of the contract -- matters only insofar as the length makes it more or less probable that the individual signatory was aware of the provision imposing personal liability.  See, e.g., Lollo, 35 F.3d at 35 (finding personal liability for one individual signatory where provision fixing liability appeared immediately above signature line, and rejecting personal liability for other individuals where provision allegedly fixing liability on them appeared on "page 34 of a 55-page contract"); USHA Holdings, 2015 U.S. Dist. LEXIS 133644, at *32-33 (noting provision at issue appeared on first page of agreement of "only fifteen pages"); Raymond Weil, 585 F. Supp. 2d at 483 (provision at issue appeared immediately above signature block); Porter, 2007 WL 2907403, at *3 ("[T]he contract is only eleven pages long, and few pages separate the page identifying [the individual signatory] as a party from the page on which his signature appears . . . ."); Paribas Properties, 146 A.D.2d at 525-26, 536 N.Y.S.2d at 1009 ("The letter agreement . . . is only three pages long and the critical paragraph appears distinctly above the signature.").  Likewise, the nature of the negotiation is relevant because it sheds light on whether the "liability clause" was bargained for.  See, e.g., Lollo, 35 F.3d at 35 (noting that "the provision was expressly bargained for and reached after much negotiation"); Porter, 2007 WL 2907403, at

18

*3 ("[The individual signatory] participated in negotiating the contract, and presumably had an opportunity to insist that he not be identified as a party."); <u>Paribas Properties</u>, 146 A.D.2d at 525, 536 N.Y.S.2d at 1009 (noting that individual signatory negotiated contract and "had [he] . . . not wished to undertake [a personal] obligation, [his] name[] . . . could have been deleted").

Here, the plaintiffs do not claim that the Final Contract includes a provision making Mr. Hall or Mr. Shah personally liable. Indeed, the agreement throughout denominates the "Consultant," identified as "Tier Hall Consultancy, Limited," as the party to be bound. (Final Contract, ¶¶ 2, 3.1-3.6, 3.8-3.9, 4.1-4.2, 5.2, 6.1-6.3, 7.1-7.3, 8.1-8.2, 10.1, 12.1-12.2 & Schedule 1). Furthermore, SHLD expressly disavows that it has any obligations to the "Consultant's Staff," identified as Mr. Hall and Mr. Shah (and referred to only three times in the agreement). (Monteau Letter at 1; Final Contract, ¶¶ 3.7, 12.1 & Schedule 1).

The plaintiffs make much of the fact that the Final Contract is the only agreement that both Mr. Hall and Mr. Shah signed, and that Mr. Hall's signature identifies him only as "partner" with no corporate title, while Mr. Shah's signature identifies him as "director" but includes no reference to Tier Hall Consulting in the signature block itself. (Proposed Findings, ¶ 73). This, they argue, establishes that Mr. Hall and Mr. Shah intended to be

19

"personally committed to perform under the contract," because otherwise "there would be no purpose in both of them signing the contract and in [Mr.] Hall self-identifying as a 'partner' rather than with a corporate title." (Proposed Findings, ¶ 73). While this could be interpreted as some evidence that each intended to be personally bound, it does not constitute the "clear and explicit evidence," Lollo, 35 F.3d at 35, that is required. See, e.g., Lerner, 938 F.2d at 5 (noting that "New York courts have found individual liability in rare cases" and citing the "overwhelming evidence" presented in Paribas Properties).

    D.   Costs

The plaintiffs claim costs in the amount of $710 -- $400 for the filing fee and $310 for service. These amounts are recoverable and reasonable. See, e.g., Conceria Vignola SRL v. AXA Holdings, LLC, No. 09 CIV. 6684, 2010 WL 3377476, at *5 (S.D.N.Y. Aug. 3, 2010), report and recommendation adopted, 2010 WL 3385260 (S.D.N.Y. Aug. 23, 2010).

Conclusion

For the foregoing reasons, I recommend that the plaintiffs be awarded $265,000 on their breach of contract claim only, as well as interest in the amount of $65.34 per day from March 11, 2015, until judgment is entered. I recommend that neither Mr. Hall nor Mr. Shah be held personally liable for these amounts. I further

recommend an award of costs in the amount of $710.00.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objection shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Louis L. Stanton, Room 2250, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          March 30, 2017

Copies transmitted this date to:

Matthew J. Maiorana, Esq.
Queller, Fisher, Washor, Fuchs & Kool LLP
233 Broadway, 18th Floor
New York, NY 10279
(via ECF)

Nicholas Hall
9 St. Clair St.
London
EC3N 1LQ
United Kingdom
(via U.S. Mail)

Amar Shah
9 St. Clair St.
London
EC3N 1LQ
United Kingdom
(via U.S. Mail)

Tier Hall Consulting, Ltd.
9 St. Clair St.
London
EC3N 1LQ
United Kingdom
(via U.S. Mail)